Delbert Jenkins
4004 Saint Andrews Dr.
Rio Rancho, NM 87124

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

11 JUN -3 PH 4: 29

CLERK ALBUQUERQUE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **DELBERT JENKINS, Plaintiff** | CASE NO. 11-CV-477 |
| | |
| **V.** | |
| | |
| **STATE OF NEW MEXICO**<br>**DEPARTMENT OF CORRECTIONS,** | |
| **Charlene Knipfing,**<br>**(Director of Probation & Parole)** | |
| **MICHAEL ESTRADA,**<br>**(Program Manager)** | **CIVIL RIGHTS COMPLAINT**<br>**PURSUANT TO 42 U.S.C.§1983** |
| **BARBARA ROMERO,**<br>**(Program Supervisor)**<br>**, Defendants** | |

# JURISDICTION

1) <u>**Delbert Jenkins**</u> , is a citizen of <u>New Mexico</u> who presently resides at
    (Plaintiff)                      (State)

<u>4004 Saint Andrews Dr., Rio Rancho, NM 87124.</u>
    (Mailing address)

1

**2) Defendant:  State of New Mexico, Department of Corrections**, at an entity of the State of New Mexico.  The entity is located at:  4337 State Road 14, Santa Fe, NM 87508  /  P.O. Box 27116, Santa Fe, NM 87502-0116 .
(Physical & Mailing address)

**3) Defendant: Charlene Knipfing,** is a citizen of Albuquerque, New Mexico, and is employed as State of New Mexico, Department of Corrections, Director of Probation and Parole Department.  At the time the claims alleged in this complaint arose, was this defendant acting under color of state law?   YES [**X**]          NO [_]

If your answer is "Yes", briefly explain:

Defendant has admitted in statement and in writing on numerous occasions that she was acting in her official capacity with the State of New Mexico, for the Department of Corrections. Defendant also states that she was acting under the State of New Mexico Department of Corrections Directives and best interest and with said department.

**4) Defendant: Michael Estrada,** is a citizen of Albuquerque, New Mexico, and is employed as Project and Program Manager.  At the time the claims alleged in this complaint arose, was this defendant acting under color of state law?    YES [**X**]          NO [_]

If your answer is "Yes", briefly explain:

Defendant has admitted in statement and in writing on numerous occasions that he was acting in his official capacity with the State of New Mexico, for the Department of Corrections. Defendant also states that he was acting under the State of New Mexico Department of Corrections Directives and best interest and with said department.

**5) Defendant: Barbara Romero,** is a citizen of Los Lunas, New Mexico, and is employed as Program Supervisor & Plaintiff's immediate Supervisor.

At the time the claims alleged in this complaint arose, was this defendant acting under color of state law?    YES [**X**]           NO [_]

If your answer is "Yes", briefly explain:

Defendant has admitted in statement and in writing on numerous occasions that she was acting in his official capacity with the State of New Mexico, for the Department of Corrections. Defendant also states that she was acting under the State of New Mexico Department of Corrections Directives and best interest and with said department.

**6) Jurisdiction** is invoked pursuant to 28 U.S.C. §1343(3), 42 U.S.C. §1983.


# NATURE OF THE CASE

## 1) Background of the case:

In September of 2008, Plaintiff applied for a Fugitive Apprehension Officer, with the

Probation and Parole Department, under the Department of Corrections.  After applying

online and interviewing and sending in copies of his training credentials, Plaintiff was

advised that he would hear the results before the months close.  On or about October 20,

2008.  Plaintiff was hired by Elsie Duran, Regional Manager for the Department of

Corrections, Probation & Parole Department as a Fugitive Apprehension Officer.

Plaintiff was advised of a November 14, 2008, start date at a swing shift position, at a pay

rate of $18+ per hour.

On November 10, 2008, Plaintiff was advised by Elsie Duran that after being

hired the Department of Corrections and her supervisors now had issue with his

"qualifications." Ms. Duran stated that the Department of Corrections had now changed

the pre-requisites for the Fugitive Apprehension Officer, apparently applicable to

Plaintiff's application only.  The State of New Mexico was now requiring that Plaintiff

have current "New Mexico Department of Corrections Firearms certification," instead of

a "State issued Firearms Certification, " as advertised, which Plaintiff held and had been

awarded the position.  Plaintiff reminded Ms. Duran that the advertising for the position

and none of the paperwork concerning the position ever mentioned that requirement.

Plaintiff also advised Ms. Durant that he had already given two weeks notice to his

current employer.  Ms. Duran informed Plaintiff that the new requirement came from

"higher up in the department"  the only position Higher up in the Department was held by

Charlene Knipfing.

Subsequently Plaintiff was contacted on Thursday, November 13, 2008, {the day

before previous state date} and advised that he was not going to be allowed to start the

position.  Ms. Duran offered an alternative option in which Plaintiff would work as a

regular probation officer for a year at a pay rate of $14, and in a few months could take

the Department of Corrections basic training, and then the Department of Corrections

Firearms training course.  Ms. Duran stated that at that time Plaintiff would be eligible

for any Fugitive Apprehension Officer positions.  Plaintiff agreed with reservations and

objections work in that position, as long as he would be allowed to pursue the path to the

position for which he was originally hired. This was agreed to by Ms. Duran and by

Plaintiff's immediate supervisor Barbara Romero and the Program Manager Michael

Estrada.  This was the first instance of discrimination received by Plaintiff.  It was later

discovered that the new "Firearm requirement" was not required of the White or Hispanic officers that were hired at the same time as Plaintiff.

The issues of discrimination, hostile work environment, harassment, disparaging treatment, and abusive treatment, continued constantly from that time until Plaintiff's termination in November of 2009.

Plaintiff became immediately aware that there was some tension or apprehension upon meeting with Mr. Estrada and Ms. Romero. Initially, Plaintiff thought this might me normal, since he had not interviewed with either Ms. Romero or Mr. Estrada, and it was even questionable that they had even seen his resume. However, Plaintiff also immediately noticed that his Hispanic, female, Co-worker hired on the same day, Erlinda Flansaas, had an immediately friendly interactive experience with Supervisor Romero at that initial meeting.

The disparity of treatment between treatment of older, African American, male employee, ( Delbert Jenkins) and other employees within the New Mexico Men's Recovery / Ft. Stanton division was direct and unambiguous. From the first week of employment Plaintiff noticed that he was being treated differently than his co-workers who were young, Hispanic, females and not forty-five year old, African American, male as Plaintiff. The incidents are far too numerous to mention each and every instance at this juncture, however the behavior continued the entire length of his employment with the State of New Mexico, Department of Corrections. The treatment received by Plaintiff ranged from Sex Based Harassment; Discrimination based on Race and Age; a Disparity of Treatment between Plaintiff and similarly situation employees; which created an Abusive and Hostile work environment. This behavior continued until Plaintiff was

terminated under secret and false pretenses eleven and one half months later in November of 2009.

# CAUSE OF ACTION

**Plaintiff alleges that the following of his constitutional rights, privileges or immunities have been violated and that the following facts form the basis for his allegations:**

## A) (1) Count I:  Race/Color Discrimination

Race discrimination by the State of New Mexico, Department of Corrections involved treating the Plaintiff unfavorably because his African American heritage or race or based on color discrimination involves the unfair treatment of the Plaintiff because of his black skin color complexion.

The race/color discrimination in this case involved treating Plaintiff unfavorably during the hiring, firing, pay, job assignments, promotions, training, fringe benefits, and several other condition of employment.

The harassment included: racial slurs, offensive or derogatory remarks about Plaintiff's race or color, and the display of racially-offensive symbols.  The frequency and severity created a hostile and offensive work environment, and ultimately led to Plaintiff's termination.

**(2) Supporting Facts:**

In an effort to make an initial prima fascia case concerning discrimination, the following facts are offered in summation. Plaintiff started employment on the same date as a Hispanic female who was substantially younger than him. Plaintiff and Co-worker were hired for the same position with the State of New Mexico, Department of Corrections, Probation and Parole Department, with Special Programs under the direction of Michael Estrada with Treatment Programs under the direct supervision of Barbara Romero.

One of the main elements of discrimination was the disparate treatment that Plaintiff received from his immediate supervisor, which was completely discriminatory and debilitating to his employment with the State of New Mexico. To list just a few of the items that differed from Plaintiff and his co-worker Erlinda Flansaas; Plaintiff was never trained for his position; his co-worker was trained by their immediate supervisor and our lead officer; while Plaintiff was sent on errands, to other offices, or mandatory separate lunch breaks, and assigned other duties while these training were being conducted. His co-worker received a state issued: vehicle, phone, laptop, desk, office, etc.; while Plaintiff received none of these items. Moreover, Plaintiff was required to borrow other Probation offices' state vehicles, use his personal phone, travel up to 50 miles to use an office, did not have a computer or even a desk at his disposal for nearly eleven months. In addition, Plaintiff was required to travel alone and deal with nearly 100 offenders at a site several hundred miles from his base office at Fort Stanton by himself with out the benefit of officer back-up; while his co-workers work and travel in pairs. In addition, Plaintiff was required to handle not only a double case load, but at

7

times a triple case load for several months, {for an officer who was on maternity leave in

Bernalillo}, while Plaintiff was still assigned to the Los Lunas Office and handling entire

case load for the Fort Stanton program, this resulted in a case load of approximately 180

offenders.  Furthermore, Plaintiff was required to: make files, review application packets,

run background NCIC checks, issue travel permits, enter case notes, enter payment of

their fees and fines, provide counseling, coordinate their mental and physical healthcare

treatment and issues; deal with disciplinary issues, search rooms, conduct investigations,

issue drug tests and alcohol tests, coordinate interstate transfers, issue warrants on

escapees, contact and coordinate with area law enforcement on manhunts, supervise

vehicle maintenance and repairs for our division, etc. all by himself; while his co-workers

had the assistance of other officers, the supervisor, and support staff of other divisions to

assist them in some of these duties.  The typical workload of his co-workers was

approximately 30 to 60 offenders, while his case load carried from 90 up to @180

offenders.   While Plaintiff carried double and sometimes triple the caseload, his Hispanic

/ younger counterpart, was allowed to miss deadlines, fall thirty to sixty or more days

behind in entering case notes without being discipline or having any consequence; while

Plaintiff was disciplined and ultimately terminated for not entering the above listed items

in the system within 48 hours.  This remained unbeknownst to him until Plaintiff

discovered several instances when cases were transferred to him from his co-workers and

they lacked the attention to detail and timeliness of entries to the standard for which

Plaintiff was being held and then placed on a Performance Improvement Plan.

In response to the immense workload, Plaintiff volunteered to work during lunch, come in early to work at the office, or work when he should have been off duty so that he could use a computer or borrow a desk and computer when his co-workers were not using them. Each of these attempts to keep the work timely and of maximum quality, were blocked by his supervisor Barbara Romero.  Plaintiff's supervisor ordered him in writing to take lunch breaks for a full hour, outside the office; she ordered Plaintiff not to come in early on his own time and even demanded his key to the office; and she issued a written reprimand, because he had volunteered to work for free on his own time off.

In fact many of the positive and successful duties that Plaintiff performed for the state were turned into negatives and later used for his termination.  For example, when the Women's treatment Center was shorthanded with counselors and teachers Plaintiff was approached by the Program Director to teach a "Life Skills" course for the students. Plaintiff received approval from his immediate supervisor, Barbara Romero and from the Program Manager, Michael Estrada to teach the class.  Plaintiff did all of the preparations and work associated with the class on his own time.  Plaintiff purchased class materials out of his own pocket at a second hand store for the students to use since they had none available at the program.  Plaintiff was ultimately released in part for such things as donating $2 worth of study materials to a program for these students for group use in a class, that his supervisor and her supervisor approved me teaching, only to have his supervisor claim that he was pursuing undue favor and familiarity with the offenders.

In another example, Plaintiff was tasked with handling the entire Fort Stanton program by himself as the division was short of several officers.  This required Plaintiff to travel alone to Fort Stanton, deal with all issue alone and make decisions concerning

the program on his own concerning travel permits.  Plaintiff performed the duties as

assigned, but was subsequently given two reprimands for issue travel permits on one day;

while he had issued hundred during the previous nine months, with his supervisor's

knowledge.  Moreover, even in that reprimand Ms. Romero cites to a department policy

that requires supervisor approval for **out of state travel**.  These permits were for in state

travel, and Plaintiff had followed the policy to the letter and still received a reprimand.

  During the academy, Plaintiff made several inquires to the Department of

Corrections' Basic Training Academy Instructors of how to handle various officer safety

issues when in a situation by himself.  They informed me that it should be rare that

Plaintiff would be handling these types of issues by himself.  When Plaintiff informed

them that he did so regularly due to his situation they gave Plaintiff certain approaches to

protecting himself and minimizing escalation of hazardous situations.  Plaintiff acted as

instructed in the Academy by the staff and instructors. When asked to take a hostile

offender in custody during an escalating situation he placed offender in handcuffs for

officer safety; Plaintiff received a "Secret Reprimand" for doing so in violation of

Department Policy.

  As an additional example, his supervisor, Barbara Romero placed Plaintiff on an

extensive Performance Improvement Plan which listed dozens of requirements, all of

which he met, except for a requirement that she added the final week of a 90 day plan,

which required Plaintiff to enter follow-up, follow-up notes concerning offenders,

medical treatment notes, diagnosis notes and other private medical information which

could only be gathered from doctors and other healthcare providers who refused to

provide such, under HIPAA rule and guidelines.  This was the only unmet item in his

Performance Improvement Plan or the only negative comment in his final Employee Evaluation prior to his termination.

Finally, one of the most consistently positive statements by his Supervisor and from the Program Director was his extremely professional, respectful and polite manner with the program offenders during his entire tenure with the State of New Mexico, and was listed in all of his Employee Evaluations. Again a positive was turned into a negative when a supposed incident occurred that alleged that Plaintiff had cursed out an offender and his family. Again this was via a "secret reprimand," which also lent to his termination. There are only statements from his supervisor about what witnesses stated and NO Direct statements from any witness or victims. Only the statements from his Supervisor, Barbara Romero, which consist only of second hand information created weeks or months later. Moreover, after this incident supposedly happened, Plaintiff was called several times on his personal cell phone by the alleged victim and his family on the same night this supposedly occurred. (Documented by cell phone records) Additionally, offender who was allegedly verbally abused never made a statement, was later arrested by his Ms. Romero and sent back to prison. During his probation violation hearing, his attorney subpoenaed Plaintiff and his supervisor to the hearing. Ms. Romero failed to appear herself and refused to send Plaintiff the subpoena with the excuse that she did not have his contact information. Plaintiff subsequently received a forwarded pay stub that same week sent to his address from Barbara Romero.   In contrast, his co-worker, Erlinda Flansaas, has been extensively documented in her use of profane insults, screaming and cursing fits to both male and female offenders and she was used by his supervisor to intimidate and control the population. Despite the numerous complaints

made by offenders, counselors, staff, and by me to our mutual supervisor, she was commended and praised for her abusive behavior while Plaintiff was ultimately terminated.

At the time of termination, Plaintiff was aged 43; with nearly 30 years of exemplary employment history with numerous government and private entities. Plaintiff has never been terminated or received a written reprimand. Other supervisors in the Department of Corrections and Probation & Parole division commented regularly on his work ethic and excellent people and professional skills. The only negative contact or opinion of Plaintiff was his immediate supervisor, Barbara Romero and her supervisor and Program Director, Michael Estrada, and Charlene Knipfing, the Director of the Department.

The above constitutes a summary of the discrimination and disparaging treatment Plaintiff received during his tenure at the Department of Corrections. Plaintiff was ultimately replaced by a Hispanic, male aged approximately 26 years old. His co-worker at the time of employment was Erlinda Flansaas, a Hispanic, female aged approximately 29 years old. Also hired during his term of employment was Faye Gillespie, a Hispanic / Native American, female aged in her late twenties; all stand as support for these assertions.

## B) (1) Count II:  Discriminatory Working Conditions

In addition to the discriminatory working conditions or a Hostile work environment based on other situations. Case in point, Plaintiff referrers to the tremendous and uneven workload and with the lack of tools and resources provided to

deal with this disproportionately heavy workload that only he was forced to carry.
Plaintiff can document the @180 offenders that he was assigned to while even an
experienced probation officer might see less than 100; and in his division based on the
high risk nature of the type of offender that Plaintiff was assigned to limits officers to 45
assigned offenders.  Moreover, his co-workers were never was assigned the high number
of high level offenders as the Plaintiff.  This clearly constitutes a materially adverse
employment action as it ultimately led to his termination

Other issues were of disparaging treatment are in this case, refer directly to
Erlinda Flansaas, who was hired on the exact same date of November 14, 2008, they were
supervised by the same supervisor, Barbara Romero, and they worked for the same
division of the State of New Mexico, Department of Correction within the same division
of the Probation and Parole Department.  Plaintiff and Ms. Flansaas were hired for the
same position in the same division with the same listed job duties and up to the time of
his termination they both carried the same employee status.  The only difference being
she was a young, Hispanic female and Plaintiff was an older, Black (African American)
male; also note that Plaintiff was not hired by Barbara Romero, but another supervisor in
a different department.


**(2) Supporting Facts:**

Disparity of treatment between treatment of an age 43/ older Black employee, (
Delbert Jenkins) and other employees within the New Mexico Men's Recovery / Ft.
Stanton division.  From the first week of employment Plaintiff noticed that he was being
treated differently than his co-workers  and his supervisor, who were Hispanic females.

The incidents are far too numerous to mention each and every instance, however the behavior continued the entire length of his employment with the Department of Corrections, Probation & Parole Department.

Example 1: Plaintiff was orally reprimanded for be in an office alone with a male or female offender at any time.  Plaintiff was informed of this policy and immediately corrected any instance when the offenders entered the office and closed the door behind them.  In contrast, Plaintiff's co-workers and his supervisor met on hundreds of occasions individually with male and female offenders without consequence.  The behavior was so ingrained in the department that they would automatically enter any office and close the door behind them, prior to and during his tenure with the Probation & Parole Department and they had been doing so for such a long time that it required constant vigilance, reminding and corrective action to deter the offenders from closing the door behind them without thinking.  Moreover, while Plaintiff was reprimanded up for this behavior (and it is listed in his termination letter,) his co-worker met with virtually all of the male and female offenders {she was Hispanic female} the entire twelve months of their employment in either the Fort Stanton Program and with females in the New Mexico Women's Recovery Academy alone in her office or other people's offices alone with the door closed.  She was never warned or advised that this was an issue.  [Evidence e-mail and offender / staff testimony]

Example 2: In January of 2009, Plaintiff was written up because he used the restroom in our office, because his supervisor and co-workers felt "uncomfortable" with me using the same restroom as they used.  Plaintiff tried to talk to his supervisor and explain that at the time since the facility was an all female program that he felt that by

him using an unmarked restroom without a lock in the public area of the program was a negligent choice, and that it was were inviting issues against Plaintiff by doing so.  Prior to me being able to fully elaborate on his concerns, she wrote him up for using their restroom, which was located in the office that all four of them shared.  Plaintiff was reprimanded and not allowed to discuss his concerns with his supervisor.  When Plaintiff requested a copy of the write-up, she refused.  When Plaintiff requested an opportunity to address the issued raised he was told to sign the write-up and that Plaintiff would be allowed to address his concerns to the Director of the Region, Gary Carson, in a meeting that was to be held within a few days.  In the interim, Plaintiff chose not to use the unsecured restroom in the hallway of the women's training area, but to use either the restroom that was locked most of the time in the program manager's office or to walk 300 yards and use a restroom located at the regular supervision Los Lunas Probation Office.

When Plaintiff met with Mr. Carson, Regional Manager of Region II special programs, he explained his situation and proposed and alternative plan for use of the restroom of using the restroom in the program manager's office with her approval.  Plaintiff was unaware that his supervisor intended to have him fired for using the same restroom as her and his co-workers, until Plaintiff received the contents of Ms. Romero's "Secret soft file" that showed that she found the thought of Plaintiff using the same restroom as herself so offensive that it was her intention to have him fired in January of 2009.  [Evidence – letters & e-mails]

Example 3: Working Conditions;  Plaintiff did not receive a work area or desk until late July of 2009.  His coworkers were given traditional desks and fully functioning computers from March of 2009.  When Plaintiff worked in the office at the NMWRA he

was allowed to work on a "square ironing board type" of table.  The other days of the week Plaintiff was required to travel to the town of Bernalillo, or to Albuquerque "Gold Office", to "The Farm" { level 4 correctional facility} in Los Lunas and later at the Los Lunas regular supervision office.   All travel to and from these other offices were at his own expense and any additional travel time was during his own time. [Evidence – E-mails]

Further, from the months of March through November of 2009 Plaintiff had a case load of offenders that was two to three times the amount that were carried by his Hispanic female co-workers.  His case load went as high as 160+ offenders where as the position mandated that no more than 45 offenders be handled by one officer.  The highest case load that his co-workers handled was 60 offenders.  To further illustrate the point, Plaintiff received written reprimands for not keeping up with this case load, while his fellow officers were further behind than him in entering case notes and received no negative commentary. [Evidence – e-mails & case load lists]

Example 4: Performance Improvement Plan;   Plaintiff was ordered to enter into a PIP which among the numerous requirements, which all of them were met by him except one condition.  Barbara Romero stated that Plaintiff had not written sufficient follow-up notes, to the follow-up notes, concerning those offenders that had gone to the doctor and subsequently returned to the program.  Plaintiff's supervisors, Barbara Romero and Michael Estrada, requested that Plaintiff write-up notes on the diagnosis and treatments on these offenders, when Plaintiff was not privy to these items from the hospital or treating physician.  This practice was also in violation of HIPAA laws and rules.  The entering of this information in the CMIS system was a violation of HIPAA.

In contrast Plaintiff's co-workers seldom mentioned that their offenders went to the doctor in their case notes, let alone the fact that they had been treated in any way. Moreover, routine notes for them amounted to one or two abbreviated sentences that were often as late as six to eight weeks from the prior entry.  Plaintiff, however, was written up repeatedly for not entering a paragraph plus worth of data within a week of prior entry. [Evidence e-mails + CMIS data]

Example 5: Computer access.   Plaintiff was reprimanded for not keeping timely entered computer information, for not remaining current on all of his files.  Plaintiff did not receive a fully functioning computer or even a desk until the middle of September of 2009.  His co-workers and supervisor had fully functioning computers from March of 2009.  Hence Plaintiff had to travel to Bernalillo, Albuquerque, and other Los Lunas locations to use a computer.   His co-workers could work from the office, take their lap-top home on weekend or evening etc.  [Evidence e-mail]

Example 6: Conveyance of information and correction of behavior.  When his co-workers made a mistake, they were told "no problem, let me show you later how to do that," then they were given an opportunity to correct the behavior, they received this additional training when Plaintiff was required to be out of the office.  However, if Plaintiff made any errors in operation or judgment, he was written-up secretly.  Notes were made in a soft file, and not only did they fail to advise him that he had made an error, this information was withheld from Plaintiff until February of 2010.  Not only was he not allowed to address or change the behavior he was unaware there were any issues, despite his repeated requests for clarifications or information on procedures, policies or practices to his supervisor.

17

Example 7: Alternatively, Plaintiff was dismissed allegedly because, he was unable to keep up with input of data and follow-up data in the CMIS System and in his overall handling of his case load.   Plaintiff completed his review and of his Employee Evaluation in which he received an "Achieves in all categories" except in "entering follow-up on critical incidents being entered in cited notes." The only "follow-up" notes not entered were medical treatment and diagnosis information that an offender / patient had received from his doctor.  To enter these notes would have been in violation of HIPPA laws.

Example 8: Disparaging / overtly heavy case load.  During his 11+ months with the Dept. of Corrections, Probation & Parole Dept.  Plaintiff was responsible for two full case loads, which would normally require two full time probation & parole officers.  In addition, there was a few month time period where Plaintiff was handling the case load of three people, his typical two person case load and then the case load of a third person on maternity leave in a different probation office.  Moreover, he did so without a computer to utilize fulltime.  Plaintiff was also required for several months to travel to several different offices to utilize office, desk and computer space and still maintain standards of work higher than his co-workers.  Finally, Plaintiff did not receive a computer that had full access to department network and software until late September of 2009.

In contrast his Female / Hispanic co-workers had office space in early 2009, and a lap top computer with full access to all department resources.  Further, when a new female / Hispanic officer was hired in June of 2009, she immediately was issued a desk and a computer with full access to all department network sources and  software within two weeks.  During this time, Plaintiff remained without a fully functioning computer

until late September. The only difference between Plaintiff and his co-workers was he was a black, male, age 42; and they were Hispanic, female aged in their twenties. Plaintiff was constantly being harassed by his supervisor for not getting his work done. When Plaintiff reminded his immediate supervisor of the lack of resources, especially the computer, he was either ignored or was told "they are working on it."

Furthermore, when his immediate supervisor Barbara Romero, transferred cases to him, from his younger, female, Hispanic co-workers these cases had not been updated in the system for up to 6 weeks, while Plaintiff was being harassed, reprimanded and ridiculed for not keeping his cases up to date by a week or less; his co-workers were more than a month behind. Furthermore, there were reports that were not being filed and release documents, arraignments and deadlines that were not being met by his younger / Hispanic co-workers. Their clients were approaching Plaintiff to correct release dates, approve travel permits, secure medical treatment, etc. and he was ordered to assist them as needed and they knew it would cause delays in his own work load. Plaintiff managed to keep his case load caught up and to maintain this level throughout the last few months of his employment as shown on his employment review. In contrast his female / Hispanic co-workers were allowed to remain up to six weeks behind in their work and were never reprimanded and in fact continued their employment with the state for an indefinite future.

Example 9: Plaintiff was reprimanded on April 29, 2009. He was given an Oral Reprimand for working extra hours. "Working overtime without permission, with the knowledge of your Court Commitments the following day and would put you over 40 hrs without the possibility of taking flex time." Plaintiff was terminated in part for working

extra, when he had no control over the length of courtroom procedures.  When Plaintiff

attempted to respond he was told that this was not her decision and that people above her

had forced her to discipline him. {Michael Estrada & Charlene Knipfing}   Plaintiff tried

to remind her that part of the extra hours was working with New Mexico State Police in

testing an unknown substance that initially tested positive for cocaine that was found in a

package at the Fort Stanton facility.  She stated that she knew, but this wasn't entirely her

decision and that there were forces beyond her control at work on this instance.  {In

reference to Charlene Knipfing and Michael Estrada}

  Moreover, when asked the prior Friday by Ms. Romero, "was I going to be able to

leave on flextime early enough?"  Plaintiff responded that it does not appear that he

would, but he did not want to cause any trouble, he offered to work for free or donate his

time to the state, so that he did not miss his court appearance.  Ultimately, Plaintiff was

unable to take the hours due to a court appearance. Plaintiff was paid overtime and was

then given an "Oral Reprimanded on April 29, 2009" for working those hours.  The fact

that he produced his proposed schedule at the start of every week should have been

sufficient prior approval.  Finally, since Plaintiff was handling as many as 160+ offenders

or nearly three full caseloads, should have received some flexibility or communication

other that being written up and ultimately fired.  During this time his co-workers worked

additional hours and were never reprimanded and also were allowed to use their flex time

any time they wanted, where as Plaintiff was required to use his flex time in the same

week that it was incurred.

  Example 10: Direct Evidence of Racial Threats & Discrimination. In September

of 2009 Plaintiff received a Death Threat from an unknown party, at the Los Lunas

facility.   On that day, his supervisor, Barbara Romero and his Co-Workers from the New

Mexico Women's Recovery Program were in one of their secret meetings.  After their

meeting they covertly left the office and went elsewhere on the property, as their vehicles

remained on property.  They were gone from the office for an unknown period of time.

Plaintiff had received some phone messages for his supervisor, Barbara Romero. Plaintiff

states that he knew they had returned because he could hear them laughing in the office

next door so he went to the office and knocked on the door to deliver Ms. Romero her

messages.

When given permission to enter Plaintiff entered and observed inside the office

that Barbara Romero, Erlinda Flansaas, and Faye Gillespie laughing and joking in a

friendly manner as usual.  Plaintiff delivered the messages and began to leave, when Faye

Gillespie asked Barbara Romero, "should we tell him?"  Supervisor Romero responded "I

don't care, if you want...yeah go ahead."  At that time Plaintiff asked "what's going on?"

Erlinda Flansaas responded with a chuckle..."they left a message for you in one of the

dorms."  Plaintiff asked which one as there are several; she responded one of the middle

ones, and to go take a look.

Plaintiff began a search of the dorms by himself and after an extensive search

discovered the following sign on the back of one of the dorm room's doors, **"187 on a**

**Nigger."**  Plaintiff took a picture of the item with his cell phone and made note of whose

room the item was located.  Plaintiff then returned to the office and requested that he be

allowed to conduct an investigation into the source of the sign.  The meaning of the sign

is clear to those with either a "street" background or law enforcement background that

187 in law enforcement radio code often means murder... the rest was obvious based on

the historical and current use of the term nigger to refer to a black person. Plaintiff was the only black (African American) person on that staff, was most likely the target of that threat. There were possibly 1 or 2 black residents in other dorms. Either a threat of this type, to a resident or to himself, should have been taken extremely seriously.

Plaintiff began to conduct an investigation with the residents of the dorm room where the sign was found. He did so in the presence of his supervisor and co-workers in his supervisor's office. After questioning, both residents stated that they did know about the sign, but did not know who put the sign up. Plaintiff stated that since it was in their room and they knew about it, they would be placed in custody until the investigation was complete. He placed the two subjects in handcuffs for officer safety and possible transport.

Subsequent questioning after the residents were placed in handcuffs presented testimony that a prior resident had placed the sign in the room prior to departure. At that point, when the name was mentioned, his co-workers immediately took over the investigation and subsequently his supervisor stated that she would take care of the investigation and ordered the two residents be released. Plaintiff did so at her direction. He was never advised of the outcome or any other steps which were taken in pursuant to that investigation.

## C)(1) Count III:  Retaliation

The State of New Mexico, Department of Corrections fired, harassed, and otherwise "retaliated" against Plaintiff because he complained to his employer about discrimination on the job.

**(2)Supporting Facts:**

After repeated Request for meeting with Plaintiff's immediate Supervisor Barbara Romero's, Supervisor and the Program Manager, Michael Estrada.  Plaintiff was finally granted a meeting in June of 2009.  Among the many issues raised about how to be a better employee, and how to communicate with his immediate supervisor Barbara Romero, Plaintiff expressed concern over the conflicting messages that he was receiving from her.

In addition, Plaintiff expressed concern over the disparaging treatment that he received from his supervisor that differed from his co-workers.  Mr. Estrada dismissed this as differences between the two programs of New Mexico Men's Recovery Program and the New Mexico Women's Recovery Program.  Plaintiff also expressed some concern that his supervisor appeared to have issue with communicating with Plaintiff, to the point that he felt Ms. Romero had a personal or other issue with Plaintiff, but at the time was unsure of the source of the discriminatory or differential treatment that he was receiving.

Mr. Estrada informed Plaintiff that he would communicate this and his other concerns with Ms. Romero.  This occurred despite the fact that Plaintiff was immediately concerned that he would be on the receiving end of additional hostile acts and behaviors. Not only did the hostile and discriminator acts continue after Plaintiff's meeting with Mr. Estrada, they intensified.  After the meeting, Ms. Romero began to limit which offices that Plaintiff was allowed to work out of, even though he continued to function with out

an office, computer or training.  She completely refused to communicate with Plaintiff

other than to criticize work product, accuse him of miss deeds, or to assign more work.

In addition, Plaintiff began to hear from his clients/ offenders that Ms. Romero

and his co-workers Erlinda Flansaas and Faye Gillespie, were conducting

"investigations" about Plaintiff and any potential misdeeds that he may have made.  This

approach was taken to the extreme when clients were offered early release if they would

make a statement about fabricated incidents or infractions made by Plaintiff.

Further, those offenders that were seen as friendly to Plaintiff were targeted as

trouble makers within the Ft. Stanton and later the NMMRA and ultimately had their

Probation or Parole violated.  They were charged and later dismissed for threatening

other residents of the program, discovered with "weapons" [often construction materials

from making repairs to the buildings in Los Lunas].  They utilized their own testimony

and bribed / bartered testimony from other residents of the program, by granting them

early release or extended furloughs.

Despite this behavior and the continued hostile work environment, Plaintiff

continued  working diligently in his position.  Later, he began to receive anonymous

death threats "187 on a Nigger" and received reprimands for working extra or for

conducting practices that had been established previously.  Plaintiff was also placed on a

"Work Improvement plan" that despite the fact that he had no computer and had met all

of the listed deficiencies that his co-workers still did not have to meet.  The "Work

Improvement Plan" was amended every week, and an additional duties / deficiencies

were added so that Plaintiff could not meet all of the requirements, as in the instance of

been advised of the need to make additional follow-up notes to his follow-up notes

24

concerning hospital visits when Plaintiff had been previously advised not to include medical / private information to CMIS. This was also different from what was being completed by any other probation officer and specifically those operating within the same program.

Ultimately, Plaintiff was terminated, despite his positive review and for items and actions that were false. It also appears that in February of 2010 when Plaintiff received a copy of the "soft file" after grieving for said information that it was his supervisor, Ms. Romero and the Program Manager, Michael Romero's intent to have him fired in January of 2009. The regional Director Gary Carson did not agree with this movement to fire him without cause. However, after Regional Director Gary Carson retired in August of 2009, they used his vacancy to terminate him in retaliation for his assertions of differential treatment and discrimination.

Plaintiff also notes that there was an intensification of mistreatment by his immediate supervisor, Barbara Romero after he met with her supervisor, and Program Manager Michael Estrada and discussed his concerns of disparaging and / or inconsistent treatment by his immediate supervisor, (Barbara Romero).

After that meeting two things happened. One, Plaintiff's immediate supervisor began maintaining a "Secret Soft File," of issue in which Plaintiff was being reprimanded and "warned" for certain behavior, without disclosing these issues to Plaintiff or even making him aware that his performance in duties, was not to her preference. And when Plaintiff asked for training, feedback, questions of procedures and priorities, his requests was ignored, and this file was used block transfers within the department, to new jobs, to deny him unemployment after his termination.

Further, Plaintiff was unaware of the increased level of retaliation in some sense of the word, but keenly aware of disparaging treatment. The full extent of hostile treatment remained secret, until Plaintiff received a copy of this information in February of 2010. Finally, there were no written grounds other than the dismissal letter in his Personnel File even two months after his termination that addressed the issues for which Plaintiff was supposedly terminated. Further it should be stated that a grievance process had to be filled and pursued for several months to receive any type of documentation that addressed the grounds for his termination. Additionally, the State of New Mexico, Department of Correction's Grievance procedures and policies required that, no discrimination or EEOC type issues be raised in a grievance process, hence, his supervisor was aware of the beginning of his claims through the chain of command, and began the intensification of her discriminating actions because of the initiation of that communication.

## D)(1) Count IV:  Sex-Based Discrimination

Sex discrimination involved the treatment of the Plaintiff unfavorably because of his sex as a male. The law forbids the State of New Mexico, Department of Corrections discrimination against Plaintiff during his employment, including firing, job assignments, promotions, fringe benefits, and other conditions of employment. Finally Plaintiff was also subjected to Sex Discrimination Harassment via verbal harassment by offensive remarks about Plaintiff's sex. The harassment was frequent or severe during the entire term of employment and thus created a hostile or offensive work environment. The

harasser was the Plaintiff's supervisor (Barbara Romero), and  Plaintiff's co-worker,

(Erlinda Flansaas).


**(2)Supporting Facts:**

Sex Based Harassment.  In addition to the racial statements that were made and

sanctioned.  The most grievant behavior was allowed, overheard and by her refusal to

correct or admonish these types of statements made by her employee.  Barbara Romero,

supervisor for the New Mexico Men's & Women's Recovery Academies, knew of and

sanctions the below listed comments that were made repeatedly by female co-worker,

Erlinda Flansaas.  The comments were made repeatedly and frequently from November

of 2008 till November of 2009.  Due to the frequency of use, weekly to several comments

made in a single day each instance is not documented, not is each variation of phrases.

The comments were made about Plaintiff, male residents, male duty officers, and even

male relatives of male or female residents.  The comments include the following:

"Do what I tell you or I'll put his foot in your ass…I'll treat you like a little bitch."

"Oh he thinks he is tough, …well give him to me I will take care of him… I can fix any
man…and put him in his place."

"I can go from zero to bitch in one second flat and put any man in his place."

"If you don't do what I tell you to do, then I will treat you like a little boy."

"I hate men and their stupid crap"
"You men are all the same…idiots"
"Men are stupid"
"These men are all stupid"
"I hate men and their crap"
"Men are retarded"
"I am sick of men"
"Men are useless"

"I hate anything with a penis"

These are a sampling of the type of statements made to, about, and around Plaintiff.

These statements were made to Plaintiff and to male residents of a treatment facility.

These statements were offensive, threatening and demeaning.


## E)(1) Count V:  Age Discrimination

Age discrimination involved the treating of the Plaintiff less favorably because of

his age.  Pursuant to the Age Discrimination in Employment Act (ADEA), I am

forty-five years of age.  The State of New Mexico discriminated against Plaintiff in

the following areas of employment, including hiring, firing, pay, job assignments,

promotions, training, fringe benefits, and other conditions of employment.

Furthermore, Plaintiff was harassed because of his age.  The harassment

included offensive remarks about a Plaintiff's age.  Additionally, the harassment

results in an adverse employment decision, of hiring, transfer, exclusion from

training and ultimately termination.  The harasser were Plaintiff's immediate

supervisor, (Barbara Romero), the program manager (Michael Estrada), and co-

workers, (Erlinda Flansaas & Faye Gilespie).

### (2)Supporting Facts:

After several months with the State of New Mexico, Department of Corrections,

Plaintiff was required to attend their Probation & Parole Officer Basic Training Class.

During which, it was made clear that "older" officers would have difficulty in completing

the physical portion of the training and that ultimately that was the purpose of the

severity of the training.  Despite this fact, in March of 2009, Plaintiff successfully

completed the Department of Corrections, Probation and Parole Officer Basic Training

Course and was the oldest of those that had successfully completed the course.  All that

was remaining was completion of the 1 week firearms certification training to be held

later in 2009.  Plaintiff requested approval from his immediate supervisor, and the Region

Manager, Gary Carson for approval and authorization to take the Firearms Certification

training.  Plaintiff received immediate approval to take the training, from Barbara

Romero and from the Region 2, Special Programs Manager, Gary Carson.

      However, when the training was offered in November of 2009, and Plaintiff

requested to attend the training, he was refused to be allowed to attend the training or to

even begin the process by Michael Estrada, the Program Manager.  Despite his prior

agreements and despite his prior approval by the Region Manager, Gary Carson.

      Plaintiff made application for the following positions in different offices of the

Probation and Parole Department, 4 applications to the Sex offender Unit in

Albuquerque, 2 applications to the Intensive Supervision unit in Albuquerque, 2

application to the Probation & Parole office in Rio Rancho, 2 applications to the Call

Center in the Albuquerque PPO office, 1 application to the Roving PPO position in the

Albuquerque Region 2 office.  Plaintiff never even received a second interview for any of

the listed positions during his tenure with the Probation and Parole Department.

      Of the numerous applications made by Plaintiff to different positions within the

department, he discovered none of these applications or interviews or were there any

indications of his applying to these positions in his permanent personnel file by

December of 2009.  No indications, notations or referenced were made to his official

personnel file, during or after his application for any of these interdepartmental applications. Since a log is kept of people who have had access to the personnel file, and that the log does not show any of the interviewing managers or other department personnel have reviewed or inspected the items in his Permanent Personnel File. It seems that all references were made to the "secrete soft file" that was held by his immediate supervisor Barbara Romero or by the Program Manager Michael Estrada, unbeknownst to Plaintiff. Plaintiff was unaware of the secret soft file until December, 2009. Written request was made for this file in December 2009, January 2010, and February 2010, at that time, some of the contents were forwarded to Plaintiff in mid February, 2010.

Finally, Plaintiff began to become suspect of the fairness of the Probation & Parole's hiring / transfer practices, when he applied to the two Probation & Parole Officer positions in the Rio Rancho PPO. Before the position was listed, he sent an E-mail letter of interest to the Rio Rancho Office manager, Aubyn Roades. Plaintiff based the possibility of the opening on the announcement that two of the officers were leaving from that office. Several weeks later, the Department roster showed that two probation officers had been hired for that position. Plaintiff noted that there was never an announcement inviting officers to apply to those positions. Plaintiff then sent a second e-mail to Aubyn Rhoads, the Rio Rancho Branch Manager and asked why he had not even been considered or offered an opportunity to apply for the position. Plaintiff received no response from him at that time. However, a few days later Plaintiff was advised, without notice that he was to interview for some open positions within the department, via teleconference from the Los Lunas Standard Supervision Probation & Parole Office. During that process Plaintiff asked three times what position that he was interviewing for,

as it was unclear what he was interviewing for or even who Plaintiff was interviewing

with. After the interview started, Plaintiff noticed that Mr. Rhoads the Manager from Rio

Rancho, turned off his camera and monitor. Despite this farce that interviews were being

held for those two positions in Rio Rancho, the original two hires remained and the

interview process was only an after thought to cover their lack of following procedure or

their continued refusal to hire or transfer older probation officers to certain probation &

parole offices.

Finally, there were numerous comments, and internal office issues and situations

that were based on either race, or age or both that are incorporated with the supporting

facts under the racial discrimination supporting facts and arguments. [Evidence via e-

mail & letters]

## D) PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

**1) I have previously sought informal and formal relief from the**

**appropriate administrative officials regarding the acts complained of in**

**Part C.      Yes [X]      No [_]                If your answer is "Yes"**

**briefly describe how relief was sought and the results.**

**2) Relief sought through the Department of Corrections, via chain of**

**command: Result Harassment and Termination.**

**3)  2nd Relief sought through the Department of Corrections Grievance**

**Process: Result support of the previous determination**

4) 3rd Relief sought EEOC: Notice of Right to Sue – Issues

undetermined by the Agency

## E. REQUEST FOR RELIEF

I believe that I am entitled to the following relief: Monetary compensation for lost

wages, benefits and retirement.  Monetary compensations for lost wages from

unemployment and the use of illegal and discriminatory employment reviews.

Monetary compensation for compensatory and punitive Damages from the listed

Defendants, jointly and severally liable for the sum of One-Million Dollars

($1,000,000).

Signature of Petitioner

Delbert Jenkins
4004 Saint Andrews Dr.
Rio Rancho, NM 87124
(505) 896-0940

## DECLARATION  UNDER PENALTY OF PERJURY

I, the undersigned, declare under penalty of perjury that he is the plaintiff in the above action, that he has read the above complaint an that the information contained therein is true and correct.  28 U.S.C. Sec. 1746.  18 U.S.C. Sec. 1621.

Executed at: _____ On _____ 2011
　　　　　　　　　　(Location)　　　　　　　　　　　　(Date)

_____
(Signature)